UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

Corina Spink-Krause,

      Plaintiff,

v.                            Case No. 16-12148

Medtronic, Inc.,              Sean F. Cox
                                    United States District Court Judge

      Defendant.
_____/

## OPINION & ORDER
## GRANTING IN PART, AND DENYING IN PART,
## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Plaintiff filed this action against her former employer, alleging three claims: 1) a "sex-plus" discrimination claim under Michigan's Elliott Larsen Civil Rights Act ("the ELCRA"), with the plus factor of having children; 2) a hostile work environment based on sexual harassment claim under the ELCRA; and 3) a retaliation claim under both the ELCRA and Title VII. The matter is currently before the Court, following the close of discovery, on Defendant's Motion for Summary Judgment. The parties have fully briefed the issues, and the Court heard oral argument on October 12, 2017.

For the reasons set forth below, the Court shall grant the motion in part and deny it in part. The Court shall grant summary judgment in Defendant's favor as to Plaintiff's "sex-plus" discrimination claim under the ELCRA, because Plaintiff has failed to establish the fourth element of a prima facie case. The Court shall also grant summary judgment in Defendant's favor as to Plaintiff's hostile work environment based on sexual harassment claim under the ELCRA because Plaintiff cannot establish respondeat superior liability. But the Court concludes

1

that Defendant is not entitled to summary judgment in its favor as to Plaintiff's retaliation claim under the ELCRA and Title VII because, construing the evidence in the light most favorable to her, there are genuine issue of fact for trial.

## BACKGROUND

Plaintiff Corina Spink-Krause filed this action against Defendant Medtronic, Inc. on June 13, 2016, asserting the following claims: 1) "Hostile Environment Sexual and/or Gender Harassment in Violation of ELCRA" (Count I); and 2) "Retaliation in Violation of Title VII and ELCRA" (Count II[1]).

Pursuant to this Court's original Scheduling Order, discovery was set to close on February 7, 2017. (D.E. No. 9). At Plaintiff's Counsel's request, however, discovery was extended and this Court's Second Scheduling Order provided that discovery would close on April 7, 2017. (D.E. No. 19). The docket reflects that Plaintiff filed no motions to compel discovery.

Following the close of discovery, Defendant filed a Motion for Summary Judgment. (D.E. No. 21). Plaintiff's Counsel requested an extension of time for responding to Defendant's motion and this Court granted the requested extension, over Defendant's objection. (*See* 7/20/17 and 7/31/17 text-only orders).

This Court's practice guidelines, which are expressly included in the Scheduling Order issued in this case, provide, consistent with Fed. R. Civ. P. 56 (c) and (e), that:

a. The moving party's papers shall include a separate document entitled Statement of Material Facts Not in Dispute. The statement shall list in separately numbered paragraphs concise statements of each undisputed material fact,

---

[1]Although labeled "Count III," this is the second count.

supported by appropriate citations to the record. . .

b.  In response, the opposing party shall file a separate document entitled Counter-Statement of Disputed Facts.  The counter-statement shall list in separately numbered paragraphs following the order or the movant's statement, whether each of the facts asserted by the moving party is admitted or denied and shall also be supported by appropriate citations to the record.  The Counter-Statement shall also include, in a separate section, a list of each issue of material fact as to which it is contended there is a genuine issue for trial.

c.  All material facts as set forth in the Statement of Material Facts Not in Dispute shall be deemed admitted unless controverted in the Counter-Statement of Disputed Facts.

(D.E. No. 19 at 2-3).

In compliance with this Court's guidelines, in support of its Motion for Summary Judgment, Defendant filed a "Statement of Material Facts Not In Dispute" ("Def.'s Stmt.).  In response to that submission, Plaintiff filed a "Counter-Statement of Disputed Facts" (Pl.'s Stmt.").

The following material facts are gleaned from the evidence submitted by the parties, *viewed in the light most favorable to Plaintiff*, the non-moving party.

Plaintiff Corina Spink-Krause is a female who has children.  (Def.'s Stmt. & Pl.'s Stmt. at ¶¶ 2-3).

Defendant Medtronic is a healthcare solutions company that provides medical technologies, services, and solutions to hospitals, doctors, and other health care providers.  (Def.'s Stmt. & Pl.'s Stmt. at ¶¶ 4).

Defendant hired Plaintiff in February of 2001, as a Sales Associate in its Surgical Technologies Group.  In October of 2001, Plaintiff was promoted to Area Sales Manager ("ASM").  (Def.'s Stmt. & Pl.'s Stmt. at ¶¶ 5-6).

As an ASM, Plaintiff was responsible for coordinating the sale and support of ear, nose, and throat ("ENT") products to hospitals, doctors, and other Medtronic customers in her assigned sales territory. (Def.'s Stmt. & Pl.'s Stmt. at ¶¶ 6). Defendant had a written Job Summary that described Plaintiff's duties and responsibilities. (Def.'s Ex. 4). As a ASM, Medtronic expected Plaintiff to achieve 100% of her quota in all sales categories, to work to retain existing business, to develop new business, and to develop and support clinical relationships with her customers. (*Id.* at ¶ 8).

Plaintiff worked as an ASM from the date of her promotion in 2001 until her termination in March of 2015. (Def.'s Stmt. & Pl.'s Stmt. at ¶ 9). In addition, for two or three years during that time period, Plaintiff also served as a Field Trainer at Medtronic. (Pl.'s. Dep. at 17).

In May Of 2012, Medtronic promoted Greg Bonner to Regional Sales Director for the STG's Midwest Region. (Def.'s Stmt. & Pl.'s Stmt. at ¶ 10). The Midwest Region included three ENT sales territories in Michigan. (*Id.*). Bonner became Plaintiff's immediate supervisor at this time.

Defendant's motion and supporting papers stress that Medtronic received some complaints relating to Plaintiff's performance from customers starting in 2012 and references: 1) an April 2012 complaint from the University of Michigan Hospital (*see* Def.'s & Pl.'s Stmts. at ¶¶ 17-20); 2) an August 2012 complaint from St. Mary Mercy Hospital (*Id*. at ¶¶ 21-29); and 3) an August 2012 complaint from Biotronic. (*Id*. at ¶¶ 30-33). The record presented reflects, however, that Plaintiff never received a written warning or write up – of any nature – from the date of her hire in 2001 until after she complained to Human Resources in April of 2014.

In August of 2013, Plaintiff was given a written evaluation, titled "Performance and

Development Summary," by Bonner.  (Def.'s Ex. 10).

Bonner rated Plaintiff as "Strong" or "Solid" in six of nine specified areas: "Mission Values," "Compliance and Integrity," "Clear Thinking," "Driven to Win," "Boundaryness," and "Global."  There were three areas that Bonner noted were "Areas of Focus Vital for Role:" "External Focus," "Inspires Others," and "Executes."

As to her objective to "achieve a minimum of 100% PTQ for Core Products," Bonner wrote: "Q1 was a slow start, however Q2 has started out very strong.  Q2 is currently 6% over her quota and has helped fill the deficit left in Q1.  Currently, Cori is 3% below her YTD core PTQ."  (*Id.* at Pg ID 261).

As to Plaintiff's strengths, Bonner stated "Cori has a great knowledge of our products and a passion to win.  Her *account relationships are strong*." (*Id.* at Pg ID 263) (emphasis added).  As to areas that need development, Bonner stated "Cori will need to work on administrative duties.  In addition, there is an opportunity for closer teamwork and collaboration."  (*Id.*).

In a letter written on November 15, 2013, Bonner addressed several customer complaints with Plaintiff.  (Pl.'s Ex. 11).  The letter ended by saying "[s]hould an additional customer complaint be received, a *formal Warning Letter will be issued*."  (*Id.*) (emphasis added).

On April 4, 2014, Plaintiff contacted Veronica Lambert with Defendant's Human Resources Department.  (Pl.'s Dep. at 138).  Plaintiff testified:

> Q.     And is this the first date that you made contact with Ms. Lambert in HR regarding the complaint against Mr. Bonner?
> A.     It was the first time I spoke with her, yes.
> Q.     And what was it that triggered your decision to call on that particular day?
> A.     Greg had called me that morning and had been very hostile.  He knew I was on vacation, yelling at me about stuff regarding sales, things we

> discussed a number of times, making accusations that I wasn't doing my
> job correctly, saying that James was angry with me, saying that if I didn't
> pull it together I would be fired and let go.
>
> And I just had enough. He had continued to – just kept telling me I
> was incompetent at this, a single mother should not be doing this job and I
> was at the point where I was on vacation, it had been put in and had just
> had enough and called HR.

(Pl.'s Dep. at 138-39).

Lambert told Plaintiff she would address her complaint when Plaintiff returned from vacation, which was acceptable to Plaintiff. (Def.'s Stmt. & Pl.'s Stmt. at ¶ 53).

On April 17, 2014, Plaintiff spoke with Lambert and told her she had several issues with Bonner: 1) an incident involving a "bathroom wall" comment made by Bonner; 2) an incident with Bonner involving an expense issue; 3) an alleged lack of support from Bonner, her supervisor; and 4) Bonner having made several "single mother" comments to her.

First, Plaintiff told Lambert that one evening, in either January or February of 2013, she was at a basketball game with Bonner and other co-workers. Plaintiff testified that Medtronic's new on-site representative for University of Michigan Hospital asked Plaintiff for her business card but she did not have one. Plaintiff testified that when Bonner heard this, he said, "Oh, don't [w]orry about it, if you want to find her number, it's on the bathroom wall at U of M." (Def.'s Stmt. & Pl.'s Stmt. at ¶ 57). Plaintiff testified that Bonner then "just kind of chuckled and walked away" and that she was "completely offended and walked away" because she did not know what else to do. (Pl.'s Dep. at 114).

Plaintiff did not talk to Bonner about the bathroom wall comment. (*Id.*). Plaintiff did not report the incident to Lambert, Romero, or anyone else with supervisory and/or disciplinary authority over Bonner until Plaintiff reported it to Lambert in April of 2014. (Def.'s Stmt. &

Pl.'s Stmt. at ¶ 60).

Second, Plaintiff told Lambert about an expense issue involving Bonner. (Def.'s Stmt. & Pl.'s Stmt. at ¶ 64). Plaintiff testified that at an American Osteopathic Association meeting in Orlando in May of 2013, she and Bonner had dinner with group of doctors. (*Id.* at ¶ 64). Plaintiff testified that at the end of the dinner, Bonner asked her to pay the bill so that he did not have to fill out an expense report for the dinner and Plaintiff did so. (*Id.* at ¶ 66). Later, Medtronic's legal counsel called or sent Plaintiff an email asking her why Bonner did not pick up the check, as he was the most senior Medtronic employee at the dinner. (*Id.* at ¶ 67). Plaintiff called Bonner and Bonner told her to tell Elder that Bonner had left the dinner early and that is why he did not pick up the check. Plaintiff did as Bonner asked. Medtronic did not discipline Plaintiff regarding this event. (*Id.* at ¶ 70-73).

Third, Bonner reported that she did not feel that Bonner supported her. (Def.'s Stmt. & Pl.'s Stmt. at ¶ 74). Plaintiff testified:

> I wasn't getting any support. I had asked – he'd call me and ask if he could come ride with me, I'd switch things around so the could come and ride with me that day because he'd call me first things in the morning and then by noon he'd call and say, "Oh never mind, I'm not going to make it."

(Plaintiff's Dep. at 104).

While Bonner was her manager, he did meet with Plaintiff three or four times at her accounts. (Def.'s Stmt. & Pl.'s Stmt. at ¶ 76). Plaintiff testified she asked Bonner to ride along with her at least a dozen times but Bonner was always too busy. (Def.'s Stmt. & Pl.'s Stmt. at ¶ 75). Plaintiff testified:

> Q.    What about were there any instances where you called Mr. Bonner and said, "I would like you to ride along with me and he said I would and didn't do that?

7

> A. Numerous times I had asked for him to schedule ride-alongs with me, but he was always too busy.
>
> Q. Can you identify the numerous occasions?
>
> A. And throughout the time he was my manager Greg rode with me a total of, I would say, three to four times max and even then he didn't ride with me, he would often ride – well, he would always ride separate because he had so many phone calls to make and my territory was really vast in drive time, so I had requested that he ride with me so we would have that time together to discuss, strategize, etc., which never – he always rode separate.
>
> . . . .
>
> Q. And when he did ride along with you what would he do?
>
> A. He wouldn't ride with me, he would ride into an account with me, he would go into an account, do what I was doing, introduce himself, but usually he was done by noon, 1 o'clock and would cut out. We would spend a half day together max.
>
> . . . .
>
> Q. Right. Anything else?
>
> A. He was unapproachable as far as being a boss. I felt like he was always busy, unable to support and I didn't feel his leadership skills, he was very helpful within the region.

(Pl.'s Dep. at 108-09 & 128).

Fourth, Plaintiff told Lambert that Bonner had allegedly made comments to her about being a single mother and whether she had the right job for a single mother, that maybe it was time for her to look for another job, that this was a hard job as a single mother, and that maybe she wasn't cut out to do sales as a single mother. (Def.'s Stmt. & Pl.'s Stmt. at ¶ 80).[2]

Specifically, during her deposition, Plaintiff testified as follows with respect to the comments Bonner made to her:

> Q. What specifically did Bonner say to you about being a single mother?
>
> A. This was a hard job as a single mother, maybe I wasn't cut out for doing sales as a single mother.
>
> . . . .
>
> Q. Anything else that he said to you about your status as a single mother?

---

[2]Bonner denies having made such comments.

| | |
|---|---|
| A. | Not that I recall verbatim. |
| Q. | Then you said that he said to you that it might be time to look for another job, correct? |
| A. | Yes. |
| Q. | And when did he make that first comment? |
| A. | About the same time as the single mother comment. |
| Q. | And did you ask him why he was suggesting to you that you might want to look for another job? |
| A. | What's [sic] the basis of being a single mother doing the job. |
| Q. | Anything else? |
| A. | No. |
| Q. | And then you said he made comment to you about being a female, correct? |
| A. | That had to do with being a single mother. |
| Q. | A single mother? |
| A. | Correct. |
| Q. | And you recall all of these comments beginning in or about the first six months that he was your manager, correct? |
| A. | Yes. |
| Q. | And we've established that he became your manager in or about May of 2012, correct? |
| A. | Yes. |

(Pl.'s Dep. at 102-04; *see also* 127 & 134).

Although Plaintiff testified that Bonner started making these alleged comments within his first six months as her manager (May-November, 2012), Plaintiff did not report the comments to Human Resources until April of 2014 because she believed things would get better. (Def.'s Stmt. & Pl.'s Stmt. at ¶ 81).

Plaintiff testified that she believed that her report to Human Resources had not been kept confidential because Bonner called her very soon after she made her complaint to Lambert. (Pl.'s Dep. at 92).

On April 22, 2014, Plaintiff reported to Lambert in Human Resources that Bonner had called her and told her not to contact anybody in HR:

| | |
|---|---|
| Q. | And what did you discuss on the telephone call? |
| A. | That I was concerned that he had called me and told me not to contact |

anybody in HR, that everything was supposed to be handled directly through him.

It looked bad on me if I contacted HR or anybody above him to discuss any issues that I ever had and that he was very concerned that I would ever call anybody else.

Q. When did Mr. Bonner allegedly make that call?

A. To me?

Q. Yes.

A. He called me the night before and I want to say again in the morning.

Q. So that would be April 21 of 2014? The voicemail was on April 22, so it it's the day before it would have been April 21?

A. Or the morning. I don't recall. I knew it was right around the time I had just talked to Veronica.

Q. Did you actually speak to Mr. Bonner?

A. Yes.

Q. Or did he leave a message for you?

A. No, I spoke to Greg.

Q. How long did that conversation last?

A. Maybe two to three minutes at the most, very quick.

Q. And tell me what you recall him saying in that conversation?

A. He told me that he was being very clear that I was not to contact HR or anyone above him, that it looks bad on me or – and him if there were any problems in the region and on myself.

So if there was any problem, I needed to contact him directly.

(Pl.'s Dep. at 143-45).

In May of 2015, Medtronic hired another ASM for Michigan for FY 2014, Alyssa Hamblin. (Def.'s Stmt. & Pl.'s Stmt. at 99). Medtronic created an expansion territory for Hamblin by taking accounts from Plaintiff and another ASM in Michigan, Kylee Paul. (Pl.'s Stmt. at 100; Pl.'s Dep. at 94).

Bonner told Plaintiff that he was the one deciding how to divide up territories for the new ASM. (Pl.'s Dep. at 96). Plaintiff testified:

Q. But in that conversation or any other conversation you had with Mr. Bonner about the realignment of accounts to create the fourth territory did Mr. Bonner ever say to you, "I'm the one deciding how these territories are going to be divided up?

A. Yes.

10

Q.    He did say that?

A.    Yes.

Q.    Did he tell you how he had decided to realign the accounts?

A.    No.

Q.    What impact did the realignment have on you?

A.    I lost one of my oldest accounts which was the University of Michigan.  It increased all of my drive time and left only two accounts within – three accounts within the closest proximity of where I live and everything else just increased drive time.

. . . .

Q.    Do you think that the fact that you're a female and you had children had any impact as to how your accounts were realigned for fiscal year of 2015?

A.    I think Greg realigned it so it would be more difficult for me to do my job.

Q.    What evidence do you have of that?

A.    I have no evidence to that, but he made it more difficult within the proximity of where I live.  Hired a rep that lived seven minutes from my house and took away all the accounts that were closest to me and gave them to the rep that lived seven minutes to my house.

Q.    Why do you believe Mr. Bonner was trying to make your job more difficult by doing that?

A.    I had gone ahead and reported him to HR and he no longer wanted to have to deal with me.

Q.    It is your testimony that you made the report to HR before the announcement of Ms. Hamblin's hiring?

A.    Yes.

Q.     And before the realignment of your accounts?

A.    Yes.

(Pl.'s Dep. at 95-98).

Plaintiff testified that she reported to Human Resources that she believed that Bonner

was retaliating against her for having made her prior report:

Q.    Did you ever tell HR that you thought the realignment of your accounts was retaliation for you having made the complaint about Mr. Bonner to HR?

A.    Yes.

Q.    You did?

A.    Yes.

. . . .

Q.    And you're certain you said, "I think Bonner has realigned by accounts to make life more difficult for me because I've complained about him to

|      | HR"? |
|------|------|
| A.   | Verbatim for what you just said, no. |
| Q.   | No, I didn't say verbatim. I'm saying is that in general what you said. |
| A.   | Yes. |
| Q.   | Well, then tell me specifically what you told HR about the issue? |
| A.   | That was almost three years ago. I can't tell you verbatim for what I said, but I will say it was along the lines of, "I know Greg has realigned this to make it more difficult because he's retaliating against me for what I've done." |

(Pl.'s Dep. at 98-99).

On May 5, 2014, Bonner wrote an email to his superior, James Romero, stating he "wanted to make [him] aware of another customer complain [sic] I have received regarding one of my ENT reps. As we've discussed, this seems to be a recurring pattern with Cori and spans multiple accounts and individuals." (Pl.'s. Ex. 5). Bonner states he spoke with a Dr. Lopatin and that Bonner asked him for details. The email notes that Dr. Lopatin told Bonner he did not want the information he gave him to be shared with Cori and Bonner told him that puts him in a "tough" and "no action" position.

A May 9, 2014 email from a customer (Dr. Steel) to Romano discussed Plaintiff and whether she was going to be reassigned to his account in the territory alignment. (Pl.'s Ex. 6). In that email, the customer expresses that he would like to remain with the representative he has most recently had servicing his account. Dr. Steel's email says that he had previously talked to Bonner about coverage issues with Plaintiff (when she had been on his account) but that Bonner "never followed up with a phone call, as [the customer] had requested." (*Id*.).

Defendant also directs the Court to complaints concerning Plaintiff's *past* service to clients, that were raised with Bonner by the new or current sales representative servicing those clients, in June of 2014. (*See* Def. & Pl.s' Stmt. at ¶¶ 121-129).

As of October of 2014, Plaintiff had reported to Bonner for 10 consecutive fiscal quarters. (Def.'s & Pl.'s Stmt. at ¶ 131). Defendant states that "[d]uring those ten quarters – from beginning of FY 2013 (in May 2012) through the sixth month of FY 2015 (in October 2014) – Plaintiff:" 1) "did not achieve 100% of her quota for total sales in 9 of 10 quarters; and 2) had a performance to plan of less than 95% in 9 of 10 quarters." (Def.'s Stmt. at ¶ 132; Bonner Affidavit).

It is undisputed that on December 5, 2014, Plaintiff was placed on a performance improvement plan ("PIP"). Plaintiff testified that Bonner was the person to notify her that she was being placed on a PIP. (Pl.'s Dep. at 160).

The PIP advised Plaintiff that her "performance is not meeting expectations for your position of an ENT Area Sales Manager and needs immediate and consistent improvement for you to continue employment with Medtronic." (Def.'s Ex. 22). The stated reasons for the PIP were: 1) Plaintiff's sales performance; and 2) customer complaints. The PIP stated that, as to the time period "through FY 15 Q3, 1/23/15," Plaintiff would be expected to achieve a minimum of 100% to quota in overall Core ENT, achieve a minimum of 100% to quota as to capital, and disposables. The PIP stated that it the stated improvement does not occur, "further disciplinary action up to an including termination of employment will take place."

A revised PIP was issued on December 12, 2014, to correct a typographical error. (Def.'s Ex. 23).

Following a physical injury, however, Plaintiff was unable to work from December 16th through January 16, 2015. (Def.'s Ex. 24).

As a result, Defendant extended the PIP an additional three weeks, until February 13,

2015.  (Def.'s & Pl.'s Stmt. at ¶ 153).

On or about March 18, 2015, Romero met with Plaintiff, with Lambert attending by telephone.  ( Def.'s & Pl.'s Stmt. at ¶ 214).  Romero told Plaintiff there had been a customer complaint from St. Luke's Hospital and Medtronic was terminating her employment because part of her PIP was not having any customer complaints.  (Def.'s & Pl.'s Stmt. at ¶ 215).  Plaintiff concedes that as of March 18, 2015, she had not met all of the objective requirements of the PIP.  (Def.'s & Pl.'s Stmt. at ¶ 216).  As of March 18, 2015, Plaintiff had not achieved 100% of her minimum quota for Disposables (she was tracking at 93.2% for FY 2015) or ENT Core (she was tracking 84.1% for the year).  (Def.'s & Pl.'s Stmt. at ¶ 219).

Thereafter, Plaintiff filed this action against Medtronic.

During her deposition in this action, Plaintiff testified that Bonner was the only individual who harassed her or subjected her to unwelcome conduct.  (Pl.'s Dep. at 99-100).  When asked to identify the harassment of a sexual nature that she had suffered from Bonner, Plaintiff testified:

> A.    Discussion of my breasts and requesting pictures – I'm sorry, asking for pictures of my breasts and discussing my breasts.
> Q.    Anything else?
> A.    No.
> Q.    And you mentioned earlier about the alleged request for pictures of your breasts, but I don't think you mentioned that he discussed your breasts with you.
>           What discussions, if any, did Mr. Bonner have with you regarding your breasts?
> A.    He just asked to see them, send pictures of them, they look great since I had implants.

(Pl.'s Dep. at 100-101).  Plaintiff testified that those comments happened more than once, although she cannot recall how many times.  Plaintiff never reported any of those comments to

Human Resources or any one else at Medtronic.  (*Id*. at 89, 91 &101).  Plaintiff testified that the comments began in May of 2013 but that no further comments were made after her April 2014 complaint (of other matters) to Human Resources.  (*Id*. at 101).

## STANDARD OF DECISION

Summary judgment will be granted where there exists no genuine issue of material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  No genuine issue of material fact exists where "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party."  *Matsushita Elect. Indus. Co., Ltd. v. Zenith Radio Corp*., 475 U.S. 574, 587 (1986).  "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252.

The Court "must view the evidence, all facts, and any inferences that may be drawn from the facts in the light most favorable to the non-moving party."  *Skousen v. Brighton High Sch*., 305 F.3d 520, 526 (6th Cir. 2002).  "The court's duty to view the facts in the light most favorable to the nonmovant does not require or permit the court to accept mere allegations that are not supported by factual evidence." *Chappell v. City of Cleveland*, 585 F.3d 901, 906 (6th Cir. 2009).  "This is so because the nonmovant, in response to a properly made and supported motion for summary judgment, cannot rely merely on allegations but must set out specific facts showing a genuine issue for trial."  *Id.*

## ANALYSIS

In its Motion for Summary Judgment, Defendant seeks summary judgment as to all three of Plaintiff's claims.

I.      **Plaintiff's "Sex-Plus" Discrimination Claim, Asserted In Count I**

Michigan's ELCRA prohibits employers to "[f]ail or refuse to hire or recruit, discharge, or otherwise discriminate against an individual with respect to employment, compensation, or a term, condition, or privilege of employment, because of religion, race, color, national origin, age, sex, height, weight, or marital status."  Mich. Comp. Laws § 37.2202(1)(a).

It is well established that a plaintiff may establish a discrimination claim under the ELCRA using either direct evidence or circumstantial evidence.   Here, Plaintiff contends that she has direct evidence and, alternatively, that she withstands summary judgment under the circumstantial evidence approach.

A.      **Direct Evidence**

"Direct evidence" is "evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions."  *Hazle v. Ford Motor Co.*, 464 Mich. 456, 462 (2001).  "Consistent with this definition, direct evidence of discrimination does not require a factfinder to draw any inferences in order to conclude that the challenged employment action was motivated at least in part by prejudice against members of the protected group.  *Nguyen*, 229 F.3d at 563 (noting that a 'facially discriminatory employment policy or a corporate decision maker's express statement of a desire to remove employees in the protected group is direct evidence of discriminatory intent.')."  *Johnson v. Kroger Co.*, 319 F.3d 858, 865 (6th Cir. 2003).

Here, Plaintiff claims that she has such direct evidence to support her sex discrimination claim.  As the direct evidence that her sex was a motivating factor in her having been placed on a PIP on December 5, 2014, and later terminated on March 18, 2015, Plaintiff identifies the single

mother comments that Bonner made to her during the time period from May through October of 2012. Plaintiff alleges that, during that time period, Bonner made comments to her about being a single mother and whether she had the right job for a single mother, that maybe it was time for her to look for another job, that this was a hard job as a single mother, and that maybe she wasn't cut out to do sales as a single mother. (Def.'s & Pl.'s Stmts. at ¶ 80).

In support of her argument that those comments constitute direct evidence of sex discrimination, Plaintiff directs the Court to a single case, *Lees v. Thermo Electron Corp.*, 2008 WL 4146375 (S.D. Ohio 2008). *Lees* is a non-binding, unpublished decision by a district court in the Southern District of Ohio that involved an age discrimination claim under the ADEA and an Ohio statute – not a sex discrimination claim under the ELCRA. (*See* Pl.'s Br. at 2).

Defendant has identified a number of cases wherein alleged direct evidence was not found to be direct evidence because it does not require the conclusion, without any inferences, that the challenge action was motivated by discriminatory animus.

*Rock v. T.N.H.D. Partners* also involved "single mother" comments. In that case, the district court considered whether "single mother" comments constituted direct evidence that the plaintiff was not given two different jobs she applied for with her current employer. *Rock v. T.N.H.D. Partners, LLC*, 833 F.Supp.2d 802 (M.D. Tenn. 2011). When she expressed interest in applying for the first position, the hiring manager told the plaintiff that she had "gravy train hours" in her current job "because she was a single mom." *Id*. at 809. When the plaintiff expressed that she was interested in a different position that became available later, the person in charge of hiring said "You are already handicapped because you are a single mom. Don't you have more important things to take care of?" *Id*. at 810. The district court concluded that the

comments did not constitute direct evidence, explaining:

> Here, the Court concludes that Hastings's and Wall's alleged statements are too abstract to constitute direct evidence of discrimination and require an inference. *See Philipsen v. University of Michigan Bd. of Regents,* No. 06–CV–11977–DT, 2007 WL 907822, at *5 (E.D.Mich. March 22, 2007) (the question "I've got an offer for you. Before I give it to you, I have a question.... Are you sure you don't want to stay at home to be with your children?" was not direct evidence of discrimination on the basis of plaintiff's status as a mother with young children as the question "does not *necessarily* evince a discriminatory intent" nor does it "*compel* a reasonable factfinder to conclude that Plaintiff's job offer was rescinded for discriminatory reasons.") (emphasis in original); *Malone v. USA Today,* 348 F.Supp.2d 866, 873 (E.D.Mich. 2004) (supervisor's alleged question as to whether the plaintiff would be coming back to work after maternity leave and alleged statement, "Why don't you take some time, think about what kind of job you will be able to do or will make you happy, think about it" were not direct evidence of pregnancy discrimination); *Fuller v. GTE Corporation/Contel Cellular, Inc.,* 926 F.Supp. 653, 656 (M.D.Tenn. 1996) (finding no direct evidence of gender discrimination in a "sex-plus" discrimination action where supervisor repeatedly made negative comments to plaintiff about plaintiff's children and told plaintiff she needed to get her priorities straight and that her job came first).

*Id.* at 816.

The Court agrees with Defendant that this is not one of those relatively rare instances where direct evidence of discrimination exists. That is because none of Bonner's  comments require the conclusion – without any inferences – that Defendant placed Plaintiff on a PIP in 2014, terminated her in 2015, or took any other adverse actions because Plaintiff was a female with children. As a result, this Court must consider whether Plaintiff can withstand summary judgment under the alternative, circumstantial evidence approach.

### B.     Circumstantial Evidence

Defendant's motion raises several issues regarding both the prima facie case and pretext showings required under the circumstantial evidence approach.

## 1.    Prima Facie Case

The parties agree that in order to establish a prima facie case of sex discrimination under the ELCRA, Plaintiff must show that: 1) she is a member of the protected class; 2) she suffered an adverse employment action; 3) she was qualified for the job; and 4) the adverse employment action occurred under circumstances giving rise to an inference of unlawful discrimination.

Circumstances give rise to an inference of discrimination when the plaintiff was replaced by someone outside of the protected class or was treated differently than similarly situated employees outside of the protected class. *See, e.g., Hazle v. Ford Motor Co.*, 464 Mich. 456, 463  (2001); *Humenny v. Genex Corp.*, 390 F.3d 901, 906 (6th Cir. 2004).

While Defendant acknowledges that Plaintiff is a member of the protected class and that her termination is an adverse action, there are numerous disputes concerning Plaintiff's ability to establish a prima facie case.  The Court need not address them all, however, because it concludes that Plaintiff has failed to establish the fourth element of a prima facie case.

In this case, it is undisputed that Plaintiff *was not replaced by someone outside of the protected class of females*.  That is because Plaintiff was not replaced, but rather, her territory was assumed by existing ASMs, who are female. (*See* Romero Affidavit).

Thus, Plaintiff attempts to meet the fourth element by showing that she was treated differently than similarly situated employees outside of the protected class.

To qualify as "similarly-situated," the employee to whom the comparison is drawn "must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Hollins v. Atlantic Co.,*

*Inc.,* 188 F.3d 652, 659 (6th Cir.1999) (quoting *Mitchell v. Toledo Hosp.,* 964 F.2d 577, 583 (6th Cir. 1992)).

Here, Plaintiff asserts her ELCRA sex discrimination claim under a "sex-plus" theory. As explained by the Sixth Circuit in *Derungs v. Wal-Mart Stores, Inc.*, 374 F.3d 428 (6th Cir. 2004):

> "Sex-plus" discrimination exists when a person is subjected to disparate treatment based not only on her sex, but on her sex considered in conjunction with a second characteristic. *See e.g., Phillips v. Martin Marietta Corp.,* 400 U.S. 542, 544, 91 S.Ct. 496, 27 L.Ed.2d 613 (1971). Under a "sex-plus" theory of discrimination, it is impermissible to treat men characterized by some additional characteristic more or less favorably than women with the same added characteristic.

*Id.* at 438 n.8.

Defendant asserts that Plaintiff cannot establish the fourth element as to Plaintiff's "sex-plus" discrimination claim because she cannot show that she was treated differently than any similarly-situated nonprotected employees. That is, Defendant contends that Plaintiff's sex-plus claim fails because she cannot identify any male comparators (single or married) with children who were treated differently than Plaintiff. Defendant directs the Court to Judge Robert Cleland's decision in *Philipsen v. University of Michigan Board of Regents*, 2007 WL 907822 (E.D. Mich. 2007).

Here, like the situation presented in *Philipsen*, the second characteristic identified in Plaintiff's Complaint is having children (*see* Pl.'s Compl. at ¶ 17, alleging that the "sexual/gender harassment to which Plaintiff was subjected by her male supervisor included the male supervisor questioning whether or not a *woman with children* was capable of performing in her position," and ¶ 30, alleging the unwelcome "comments that a *woman with children* was not capable of performing her job responsibilities.") (emphasis added).

20

In *Philipsen,* the defendant sought summary judgment because the female plaintiff could not show any disparate treatment of a male comparator and the plaintiff sought to satisfy her burden by showing that females without young children were treated differently than females with young children.  The district court noted that sex-plus discrimination "arises when an employer discriminates against a person based not only on her sex, but on her sex considered in combination with another characteristic, such as parental status."  *Id.* at *6.  The district court noted that courts are split over the issue of whether "the proper comparator may only include a person outside of the protected class who has the same 'plus characteristic' as the plaintiff (in this case, a male with young children) or whether the comparator may include any person (male or female) who lacks the 'plus' characteristic (in this case, a female without young children)." *Id.*  The court noted that the Sixth Circuit has not directly addressed the issue and that the parties had both cited nonbinding cases supporting their respective positions.  Having reviewed that caselaw, the district court was persuaded by those cases "that require the comparator to be outside of the protected class."  *Id.*

This Court finds the reasoning and conclusion in *Philipsen* persuasive.  The *Philipsen* decison explains:

> In *Fuller v. GTE Corporation/Contel Cellular, Inc.,* 926 F.Supp. 653 (M.D.Tenn.1996), the court granted summary judgment to the defendant where the plaintiff had not produced any evidence "to indicate that women were treated differently from men or that women with young children were treated differently from men with young children." *Id.* at 658. The court stated that "[e]ven in the so-called 'sex plus' discrimination analysis, Plaintiff must first show that she was treated differently from men." *Id.* Defendant also cites *Fisher v. Vassar College* 70 F.3d 1420 (2nd Cir.1995), where the court held that "[t]o establish that [the defendant] discriminated on the basis of sex plus marital status, plaintiff must show that married men were treated differently from married women." *Id.* at 1446. Similarly, the Tenth Circuit has held that "[t]o be actionable, however, gender-plus discrimination must be premised on *gender." Coleman v. B-G*

21

*Maintenance Management of Colorado, Inc.,* 108 F.3d 1199, 1203 (10th Cir.1997). The court continued:

> As one scholar has artfully explained, Title VII contemplates gender-plus claims because when one proceeds to cancel out the common characteristics of the two classes being compared ( [e.g.,] married men and married women), as one would do in solving an algebraic equation, the cancelled-out element proves to be that of married status, and sex remains the only operative factor in the equation.

> Lex K. Larson, Employment Discrimination § 40.04, at 40-12 (2d ed.1996) (emphasis added). Thus, although the protected class need not include all women, the plaintiff must still prove that the subclass of women was unfavorably treated as compared to the corresponding subclass of men.

*Id.* at 1203.

The court is persuaded by the reasoning of *Fuller, Fisher* and *Coleman.* As the *Fuller* court stated:

Discrimination against married women [or women with young children] constitutes discrimination on the basis of sex only if a different standard, i.e., the marital [or parental] status of the person, has been applied to men and women. Absent proof of the standard applied to men, obviously [P]laintiff [ ] ha[s] not established that such standard differs from the one applied to women.

*Fuller,* 926 F.Supp. at 658. *To allow Plaintiff to argue that Defendant discriminated against her as compared to women without young children would turn this gender discrimination case into a parental discrimination case.* Instead, the court agrees with Defendant that "gender-plus plaintiffs can never be successful if there is no corresponding subclass of members of the opposite gender ." *Coleman,* 108 F.3d at 1203.

*Id.* at 8 (emphasis added).

The emphasized line above concisely explains why Plaintiff's position should be rejected. Again, "[u]nder a "sex-plus" theory of discrimination, it is impermissible to treat men characterized by some additional characteristic more or less favorably than women with the same added characteristic." *Derungs, supra.* If Plaintiff is unable to show she was treated less

favorably than men without the additional characteristic of having children, then she does not have a sex plus discrimination claim.  If Plaintiff were to allowed to take her sex discrimination claim to trial by showing that she was treated differently than a female who does not have children, then the claim she would present to the jury would be a parental discrimination claim – not a gender discrimination claim.

The Court concludes that because Plaintiff has failed to produce any evidence that similarly-situated male comparators were treated more favorably, Plaintiff has not established the fourth element of a prima facie case.  As a result, Defendant is entitled to summary judgment as to Plaintiff's sex-plus discrimination claim, asserted in Count I.[3]

## II.     Plaintiff's Hostile Work Environment Based On Sexual Harassment Claim Under The ELCRA, Also Asserted In Count I

Michigan's "ELCRA prohibits employers from discriminating against employees based on sex, which includes sexual harassment.  *See* Mich. Comp. Laws § 37.2102; *Chambers v. Trettco, Inc.*, 463 Mich. 297, 614 N.W.2d 910, 915 (2000)."  *Kalich v. AT&T Mobility, Inc.*, 679 F.3d 464 (6th Cir. 2012).  "Sexual harassment that substantially interferes with an individual's employment is referred to as 'hostile work environment' harassment."  *Id.*  That is what Plaintiff

---

[3]Even if the Court were to accept Plaintiff's argument that female employees without the plus characteristic of having children could be considered comparators, the Court concludes that Plaintiff has still not presented sufficient evidence to survive summary judgment.  To qualify as "similarly-situated," the employee to whom the comparison is drawn "must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it."  *Hollins, supra.* Plaintiff has not even identified who the similarly-situated female ASMs without children were, much less presented evidence to show that they were treated more favorably (ie., not put on a PIP or terminated) despite having engaged in the same or similar conduct (not meeting objective sales goals and receiving customer complaints).

alleges here.[4]

###### A.     Prima Facie Case

"To establish a prima facie case of hostile work environment based on sexual harassment," Plaintiff is required to show that: 1) she belonged to a protected group; 2) she was "subjected to communication or conduct on the basis of sex;" 3) she was subjected to "unwelcome sexual conduct or communication;" 4) the unwelcome conduct or communication was intended to or did substantially interfere with Plaintiff's employment or created an intimidating, hostile, or offensive work environment; and 5) respondeat superior. *Kalich*, 679 F.3d at 470.

Defendant's motion asserts that Plaintiff cannot establish a prima facie case because Plaintiff concedes that she never reported the only sexually offensive conduct she complains of and, therefore, she cannot establish respondeat superior.  Defendant correctly notes that under the ELCRA, an employer can only be held liable for hostile work environment sexual harassment if the employer has either actual or constructive notice of the alleged harassment and fails to take prompt and appropriate remedial action.  *See, e.g., Chambers*, 463 Mich. at 312; *Kalich,* 679 F.3d at 474.

Defendant then directs the Court to Plaintiff's deposition, wherein she testified that: 1) the only harassment she suffered was from Bonner; 2) the only conduct of a sexual nature that she identified was Bonner having discussed her breasts and asking to see pictures of them after Plaintiff had breast implants; 3) she never reported any of those comments to Human Resources; and 4) in any event, no further comments were made after Plaintiff made her April 2014

---

[4]Plaintiff has not asserted a quid pro quo sexual harassment claim.

complaint (of other matters) to Human Resources. (Pl.'s Dep. at 99-101).

In response, Plaintiff's brief first asserts that her harassment claim need not be based upon conduct that is sexual in nature. (Pl.'s Br. at 19). To support that argument, Plaintiff directs the Court to cases dealing with Title VII – not the ELCRA. Plaintiff's hostile work environment claim was brought under the ELCRA alone and it requires the harassment to be sexual in nature, as explained in *Kalich:*

> In addition to the requirement that he was singled out because of his gender, Kalich was also required to present evidence that he was "subjected to unwelcome sexual conduct or communication." *Haynie,* 664 N.W.2d at 133. This element is derived from the language in § 37.2103(i) of ELCRA, which states that "[s]exual harassment means unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct or communication of a sexual nature...." *Id.* The Michigan Supreme Court has held that "actionable sexual harassment requires conduct or communication that *inherently* pertains to sex." *Corley v. Detroit Bd. of Educ.,* 470 Mich. 274, 681 N.W.2d 342, 345 (2004) (defining "sexual nature"); *see also Haynie,* 664 N.W.2d at 135–36; *Barrett,* 628 N.W.2d at 74–75. Discriminatory conduct that is gender-based but not sexual in nature does not constitute sexual harassment. *Haynie,* 664 N.W.2d at 135.

*Kalich,* 679 F.3d at 471-72. Thus, to the extent that Plaintiff suggests that she can base her hostile work environment claim on Bonner's alleged "single mother" comments, that argument fails because those alleged comments were not of a sexual nature.

Next, Plaintiff does not dispute that she failed to report Bonner's alleged comments about her breasts, but suggests that she can proceed to trial with a hostile work environment claim based upon her having reported Bonner's one "bathroom wall comment" to Human Resources:

> Defendant argues Plaintiff has not reported any such conduct as she had not reported the requests from Bonner, her supervisor, to see and receive photographs of her breasts. However, Plaintiff did report the comments Bonner made to a co-worker regarding Plaintiff's number being on a bathroom wall. Specially, Bonner told a new Medtronic representative at the University of Michigan, when he asked Plaintiff for a business card, "Oh, don't worry about it, if you want to find her

number, it's on the bathroom wall at U of M." (Ex. 1 - p 112). These actions and report could allow a jury to find a hostile work environment.

(Pl.'s Br. at 20).

The Court rejects Plaintiff's argument and shall grant summary judgment in favor of Defendant as to this claim. That one comment, while inappropriate, is not enough to support a hostile work environment claim. Moreover, Plaintiff cannot establish respondeat superior because no further comments were alleged to have been made by Bonner (or anyone else) after Plaintiff reported that single comment to Human Resources in April of 2014.

## III.     Plaintiff's Retaliation Claims, Asserted in Count II

In Count II, Plaintiff asserts a retaliation claim under both the ELCRA and Title VII.

Both Title VII and the ELCRA prohibit retaliation against an employee who has engaged in protected conduct under the statute. Retaliation claims under Title VII and the ELCRA are largely the same, and are analyzed under the familiar *McDonnell Douglas* burden-shifting paradigm when the plaintiff lacks direct evidence, although there are some differences.[5]

A plaintiff alleging retaliation in violation of the ELCRA or Title VII must establish the following elements of a prima facie case: 1) the plaintiff engaged in protected conduct; 2) that this was known by the defendant; 3) that the defendant took an employment action adverse to the plaintiff; and 4) that there was a causal connection between the protected activity and the adverse

---

[5]There is a difference between the two statutes (Title VII and the ELCRA) with respect to the fourth element, causation. To establish causation under the ELCRA, the plaintiff must only show that her participation in the protected activity was a "significant factor" in the employer's adverse action. *In re Rodriguez*, 487 F.3d at 1011. Title VII retaliation claims, on the other hand, must be proved according to traditional principles of "but-for-causation," which require proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer. *Frazier, supra*, at 451.

employment action.  *See In re Rodriguez*, 487 F.3d 1001, 1011 (6th Cir. 2007); *Frazier v. Richland Public Health*, 685 F. App'x 443, 450 (6th Cir. 2017).

The "burden of establishing a prima facie case in a retaliation action is not onerous, but one easily met." *EEOC v. Avery Dennison Corp.*, 104 F.3d 858, 861 (6th Cir. 1997).

## A.      Prima Facie Case

Here, it is undisputed that Plaintiff engaged in protected conduct under both the ELCRA and Title VII by virtue of complaining to Human Resources about Bonner.  There also does not appear to be any dispute as to the second element, that Defendant, and Bonner in particular, was aware of Plaintiff's protected activity.  There are disputes between the parties as to the third and fourth elements.

### 1.      Adverse Action

Defendant acknowledges that Plaintiff's termination is an adverse action, as to both Plaintiff' discrimination and retaliation claims.  Plaintiff claims, however, that she also suffered additional adverse actions, particularly with respect to her retaliation claims, which have a lower bar for what constitutes an adverse action.

A plaintiff's burden of establishing a materially adverse employment action is "less onerous" in the retaliation context than in the anti-discrimination context.  *Laster v. City of Kalamazoo*, 746 F.3d 714, 731 (6th Cir. 2014).  To establish the third element, plaintiff must show "that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination."  *Id.* (quoting *Burlington Northern*).

Moreover, the Sixth Circuit has stressed that in analyzing the significance of any given

act of retaliation, "context matters," explaining:

> 'The real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed.'" *Id.* at 69, 126 S.Ct. 2405 (quoting *Oncale v. Sundowner Offshore Services, Inc.,* 523 U.S. 75, 81–82, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998)). "A supervisor's refusal to invite an employee to lunch is normally trivial, a nonactionable petty slight. But to retaliate by excluding an employee from a weekly training lunch that contributes significantly to the employee's professional advancement might well deter a reasonable employee from complaining about discrimination." *Id.* at 82, 118 S.Ct. 998 (citing 2 EEOC 1998 Manual § 8, p. 8–14). "An act that would be immaterial in some situations is material in others." *Id.* (citation omitted). "This more liberal definition permits actions not materially adverse for purposes of an anti-discrimination claim to qualify as such in the retaliation context." *Michael,* 496 F.3d at 596 (holding that placing employee on brief paid administrative leave and 90–day performance plan meet "relatively low bar" of materially adverse action for purpose of retaliation claim); *see also Halfacre v. Home Depot, U.S.A., Inc.,* 221 Fed.Appx. 424, 432 (6th Cir. 2007) (remanding for reconsideration, in light of *Burlington Northern,* whether assigning the plaintiff a poor performance-evaluation score constituted an adverse employment action for the purpose of setting forth a retaliation claim).

*Laster,* 746 F.3d at 731. Thus, for example, being subjected to heightened scrutiny and being denied training opportunities that are provided to others, may constitute materially adverse actions. *Id.* So can being placed on a PIP that threatens termination and having job duties or accounts reassigned. *See, eg., Frazier*, 685 F. App'x at 454-55.

Although in her complaint and deposition Plaintiff asserted that Defendant retaliated against her in several ways in addition to her termination (e.g., by Bonner reassigning her accounts, not providing her with drive-along training opportunities, placing her on a PIP, soliciting and encouraging heightened scrutiny of her performance from her customers), Defendant's motion challenging the retaliation claim proceeds as if the only alleged adverse action is Plaintiff's termination. (*See* Def.'s Br. at 20). It is not, and the Sixth Circuit has made clear that you need to consider each alleged adverse action separately. *See, e.g. Benison v. Ross*,

765 F.3d 649, 659 (6th Cir. 2014) (noting that it considers "each alleged adverse action" separately).

Because Defendant's motion focuses on termination alone, Defendant's motion does not explain why the evidence pertaining to those other alleged adverse actions is not sufficient to create a genuine issue of material fact regarding whether or not Plaintiff was subject to materially adverse actions that would dissuade a reasonable employee from making a complaint about discrimination.

The Court concludes that an issue of fact exists as to the third element of a prima facie case of retaliation.

### 2. Causation

To establish a causal connection between the protected activity and the adverse employment action, a plaintiff must present evidence sufficient to raise the inference that her protected activity was the likely reason for the adverse action. *In re Rodriguez*, 487 F.3d at 1011; *see also EEOC v. Avery Dennison Corp.*, 104 F.3d 858, 861 (6th Cir. 1997) (explaining that "at the prima facie stage the burden is minimal, requiring the plaintiff to put forth some evidence to deduce a causal connection between the retaliatory action and the protected activity").

"One way by which a plaintiff can demonstrate a causal connection is to show close temporal proximity between the adverse employment actions and the protected activity." *Taylor v. Geithner*, 703 F.3d 328, 339 (6th Cir. 2013). In addition, evidence that the plaintiff experienced a retaliatory atmosphere after making a complaint has been found to support an inference of retaliation for purposes of the required causal connection. *See, eg., Imwalle v.*

*Reliance Medical Prods., Inc.*, 515 F.3d 531, 550-51 (6th Cir. 2008).

Here, Defendant's motion asserts that "no rational trier of fact could conclude that a causal connection exists between the complaint Plaintiff made about Bonner to Medtronic Human Resources in April 2014 and her termination for failing to successfully complete the PIP in March 2015." (Def.'s Br. at 21). Defendant stresses that there is an eleven month gap between Plaintiff's April 2014 complaint to Lambert and her termination in March of 2015. (*Id.*).

But Defendant's motion ignores the other alleged materially adverse actions, and their timing, and other testimony from Plaintiff that could support an inference of retaliation. Plaintiff complained about Bonner to Lambert on April 17, 2014. *Less than a week later*, on April 22, 2014, Bonner called Plaintiff and *told her that she was not to contact Human Resources, or anyone above him, again because it made Bonner look bad*. (Pl.'s Dep. at 143-45). The *next month*, May of 2014, Medtronic hired another ASM for Plaintiff's territory, who lived seven minutes away from Plaintiff and Bonner told Plaintiff that he was deciding how to divide up the sales territory. (Pl.'s Dep. at 95-98). Plaintiff then had one of her oldest accounts taken away, which increased her drive time and left her with only two accounts in close proximity to her home. (Pl.'s Dep. at 95-98). Plaintiff then complained to Human Resources about Bonner again, this time asserting that the reassignment was done in retaliation for her having previously complained about Bonner. Sometime in November of 2014, Bonner was one of two decision-makers who decided to place Plaintiff on PIP. (Bonner Affidavit at ¶ 34). In December of 2014, Plaintiff was put on a PIP that threatened termination. In March of 2015, Plaintiff was terminated, before the stated end date of the PIP.

Viewing that evidence in the light most favorable to Plaintiff, the Court concludes that Plaintiff has created a genuine issue of material fact as to whether there is a causal connection between her protected activity and the various adverse actions.

**B.      Pretext**

Once Plaintiff has met her burden of establishing a prima facie case of retaliation, the burden shifts to Defendant to provide a legitimate, non-retaliatory reason for the challenged actions.

In its motion, Defendant asserts that Plaintiff cannot establish that its legitimate, non-discriminatory reason for terminating Plaintiff is a pretext for retaliation.  (Def.'s Br. at 22).  So again, Defendant's motion proceeds as if the only adverse action alleged by Plaintiff is her termination, when that is not the case.

Where a case is at the summary judgment stage, a plaintiff seeking to prove retaliation via indirect evidence must submit sufficient evidence from which a reasonable jury could conclude that the defendant's nondiscriminatory reasons for its challenged actions are a pretext for unlawful discrimination.  *Wexler v. White Fine Furniture*, 317 F.3d 564, 576 (6th Cir. 2003).

A plaintiff can generally show pretext in three ways:  1) that the proffered reasons had no basis in fact,  2) that the proffered reasons did not actually motivate the employer's action, or 3) that they were insufficient to motivate the employer's action.  *Romans v. Mich. Dep't of Human Servs.,* 668 F.3d 826, 839 (6th Cir. 2012) (quoting *Chen v. Dow Chem. Co.,* 580 F.3d 394, 400 (6th Cir. 2009)).  The ultimate inquiry is did the employer take the challenged actions against the plaintiff "for the stated reason or not?"  *Chen*, 580 F.3d at 400 n.4.

With respect to the second kind of showing, the plaintiff argues that the sheer weight of

the circumstantial evidence of retaliation makes it more likely than not that the employer's explanation is a pretext, or coverup. Here, Plaintiff asserts that she has produced evidence to show that her performance did not actually motivate Defendant's conduct of realigning her territory and accounts, placing her on a PIP, and ultimately terminating her. (Pl.'s Br. at 18).

Plaintiff's position as to pretext in this case is a bit different than in most cases. That is because Defendant has presented evidence to show that it had objective reasons to terminate Plaintiff – because she had customer complaints and was below quota on sales. Plaintiff's pretext argument is that only became a problem for Defendant after Plaintiff complained to Human Resources about Bonner.

One way of presenting circumstantial evidence of retaliation is by showing that the plaintiff was treated differently before and after having engaged in the protected activity. *See, eg., In re Rodriguez*, 487 F.3d at 1011.

Plaintiff's position is that *before* she complained to Human Resources about Bonner, there had been some complaints from customers, but Bonner did not take any official action about them or follow up with customers to get complaints documented. For example, Plaintiff directs the Court to a May 9, 2014 email from a customer discussing Plaintiff and whether she was going to be reassigned to his account in the alignment. (Pl.'s Ex. 6). In that email, the customer says that he had previously talked to Bonner about coverage issues with her but that Bonner "never followed up with a phone call, as [the customer] had requested." (*Id*.). And despite having knowledge of some complaints from customers, Plaintiff was never written up or disciplined during the more than *ten years* she worked for Medtronic, for customers complaints or anything else. In addition, it appears undisputed that Plaintiff had not been meeting her sales

quota in the period before April of 2014, but had never been written up for that or placed on a PIP. (*See* Def.'s Stmt. at ¶ 132, stating that Plaintiff reported to Bonner for 10 quarters (during time period from May of 2012 through her termination) and that Plaintiff did not achieve her sales quota in 9 of 10 of those quarters).

Plaintiff argues that *after* she complained about Bonner in April of 2014, however, that all changed. Soon after her complaint, Bonner told Plaintiff not to make any reports to Human Resources in the future because it made him look bad – which by itself could be viewed as circumstantial evidence that Bonner was upset about her protected activity. Within a month, Defendant hired a new sales representative and gave her accounts from Plaintiff's assigned territory, including her oldest and those close to Plaintiff's home, increasing her drive time and making it more difficult to make her quota. Bonner told Plaintiff that he determined how to divide the accounts.

Bonner also began soliciting and documenting customer complaints within a month of her complaint to Human Resources. Although Bonner had previously told Plaintiff, back in November of 2013, that she would received a formal warning letter if another complaint was received, no such warning letter was given. Rather, Plaintiff was placed directly on a PIP that threatened termination. And although it appears that Plaintiff was below quota for some time before complaining to Human Resources, without being written up or placed on a PIP, when she continued to remain below quota after complaining to Human Resources she was placed on a PIP and then ultimately terminated.

Construing this collective evidence in the light most favorable to Plaintiff, a reasonable jury could conclude that Plaintiff's performance did not actually motivate Defendant to take the

adverse actions taken against her and that those actions were taken in retaliation for her having complained to Human Resources about Bonner.

## CONCLUSION & ORDER

For the reasons set forth above, IT IS ORDERED that Defendant's Motion for Summary Judgment is GRANTED IN PART AND DENIED IN PART. The motion is GRANTED to the extent that Defendant is entitled to summary judgment in its favor as to Count I. The motion is DENIED in all other respects. Accordingly, Count II shall proceed to trial.

IT IS SO ORDERED.

s/Sean F. Cox
Sean F. Cox
United States District Judge

Dated: October 23, 2017

I hereby certify that a copy of the foregoing document was served upon counsel of record on October 23, 2017, by electronic and/or ordinary mail.

s/Jennifer McCoy
Case Manager